IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**ROGER JOHN DONALD JONES,**

       **Plaintiff,**

    **vs.**                          **Civ. No. 24-441 JCH/JFR**

**MARTIN O'MALLEY, Commissioner,**
**Social Security Administration,**

       **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 12)[2] filed July 5, 2024, in connection with Plaintiff's *Motion to Reverse the Administrative Law Judge (ALJ) Unfavorable Decision Dated November 22, 2023, or Alternatively, To Remand the Case Back to the Administrative Law Judge,* filed July 31, 2024. Doc. 14. On September 17, 2024, Defendant filed a Response. Doc. 19. On September 30, 2024, Plaintiff filed a Reply. Doc. 20. The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's Motion is not well taken and recommends that it be **DENIED**.

### I.  Background and Procedural Record

    Plaintiff Roger John Donald Jones ("Mr. Jones") alleges he became disabled on March 15, 2020, at the age of thirty-one years and five months, because of post-traumatic stress

---

[1] On May 16, 2024, United States District Judge Judith C. Herrera entered an Order of Reference referring this case to the undersigned to the Court an ultimate disposition of the case. Doc. 10.

[2] Hereinafter, the Court's citations to Administrative Record (Doc.12), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

disorder ("PTSD"), depression, anxiety, paces all the time, seizure condition, and shoulder pain. Tr. 287.  Mr. Jones completed high school in 2008 and has worked as a security guard and corrections officer.  Tr. 288.  Mr. Jones stopped working due to his physical and mental impairments.  Tr. 287.

On July 15, 2021, Mr. Jones filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*. Tr. 233-39.  On July 27, 2021, Mr. Jones filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.  Tr. 224-32.  Mr. Jones' applications were denied on November 29, 2021.  Tr. 68, 69, 113-117, 118-121.  They were denied again at reconsideration on February 7, 2023.  Doc. 84, 85-97, 98, 99-111.  Mr. Jones requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 23, 2023.  Tr. 41-67.  Mr. Jones appeared before ALJ David Benedict with his attorney representative Jaime Rubin.  *Id.*  On November 22, 2023, ALJ Benedict issued an unfavorable decision.  Tr. 14-34.  On January 8, 2024, the Appeals Council issued its decision denying Mr. Jones' request for review and upholding the ALJ's final decision.  Tr. 1-6.  On May 7, 2024, Mr. Jones timely filed a Complaint seeking judicial review of the Commissioner's final decision. Doc. 1.

## II.  Applicable Law

### A.    Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance

benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[3]  If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

(5) If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

---

[3] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b).

*See* 20 C.F.R. §§ 404.1520(a)(4) (disability insurance benefits) and 416.920(a)(4) (supplemental security income); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987).  The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

  B.    **Standard of Review**

  The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley*, 373 F.3d at 1118, or if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles

have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). In undertaking

its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the

agency. *Langley*, 373 F.3d at 1118.

### III.  Analysis

The ALJ determined that Mr. Jones met the insured status requirements of the Social

Security Act through December 31, 2025, and that he had not engaged in substantial gainful

activity since March 15, 2020, his alleged onset date. Tr. 19-20. He found that Mr. Jones had

severe impairments of osteoarthritis and derangement of the bilateral knee, bilateral plantar

fasciitis, impingement syndrome of the bilateral shoulders, left shoulder rotator cuff tear, obesity,

major depressive disorder, persistent depressive disorder, post-traumatic stress disorder, and

generalized anxiety disorder. *Id.* The ALJ determined that Mr. Jones' impairments did not meet

or equal in severity any of the listings described in the governing regulations, 20 CFR Part 404,

Subpart P, Appendix 1. Tr. 21-22. Accordingly, the ALJ proceeded to step four and found that

Mr. Jones had the residual functional capacity to perform medium work as defined in 20 CFR

§§ 404.1567(c) and 416.967(c) except that

> [c]laimant can lift 50 pounds occasionally and 25 pounds frequently, stand and walk
> a total of 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday. The
> claimant can frequently push and pull with the bilateral lower extremities. The
> claimant can frequently stoop, kneel, crouch, crawl, and climb ramps, stairs,
> ladders, ropes, and scaffolds. The claimant can frequently reach overhead. The
> claimant must avoid concentrated exposure to noise (a noise intensity level of no
> more than three per the Selected Characteristics of Occupations[)]. The claimant
> can understand, remember, and carry out only simple instructions, and maintain
> attention and concentration for no longer than two-hour blocks of time. The
> claimant can occasionally interact with supervisors. The claimant can work in
> proximity but not in coordination with co-workers, and have no interaction with the
> general public. The claimant can use judgment to make only simple work-related
> decisions. The claimant can perform only occasional production rate work such as
> assembly line or hourly quota work. The claimant can tolerate only occasional
> changes in the work setting.

5

Tr. 22-32. The ALJ determined that Mr. Jones was unable to perform his past relevant work, but that considering his age, education, work experience, and residual functional capacity, that through the date last insured there were jobs that existed in significant numbers in the national economy Mr. Jones could perform.[4]  Tr. 33. The ALJ determined, therefore, that Mr. Jones was not disabled. Tr. 34.

> **A.**   **Relevant Medical Evidence Related to Mr. Jones' Ability To Do Work-Related Mental Activities**

> **1.**   **Robert D. Forsyth, Ph.D.**

On October 4, 2021, Mr. Jones presented to Dr. Forsyth to assess "claimant's ability to perform work related functions with respect to understanding and remembering instructions, sustaining concentration and persistence in tasks, interacting socially, adapting to the environment, and managing funds." Tr. 388. Dr. Forsyth documented Mr. Jones' reported background information, medical/psychiatric histories, substance abuse history, educational/vocational history, and daily activities. Tr. 388-89.

On mental status exam, Mr. Jones reported racing thoughts, nightmares and flashbacks of past trauma, avoidant and hypervigilant behavior, poor appetite, manic moods, angry outbursts, visual hallucinations, and suicidal ideation without any actual attempts. Tr. 390. Dr. Forsyth observed as follows:

> [h]e showed sporadic eye contact and was generally cooperative. He appeared to be anxious and somewhat depressed in mood though not in acute distress and was able to talk about or articulate his problems. His affect was congruent to the situation and content. Speech was clear, coherent, and goal directed for his age and IQ. He showed no obvious problems with loose-associations, hesitations, or word-finding. He was fully oriented including to person and to purpose.

---

[4] The VE expert identified representative occupations of Laundry Aide (DOT 323.687-010) medium exertion, SVP 2, with approximately 212,000 positions in the nation; Cleaner (DOT 381-687-018) medium exertion SVP 2, with approximately 300,000 positions in the nation; and Counter Supply Worker (DOT 319.687-101) medium exertion, SVP 2, with approximately 120,000 positions in the nation. Tr. 33.

*Id.* Dr. Forsyth noted that Mr. Jones' quality of thinking was intact, his abstract conceptual thinking was adequate, his memory functions were very good, his social judgment was mildly impaired, he appeared to be functioning in at least the average to possibly above average or superior range intellectually, his math functions were intact, and he showed the ability to attend, concentrate, and show persistence during the examination. *Id.* Dr. Forsyth noted Mr. Jones' subjective complaints regarding his avoidant and antisocial behavior and associated negative feelings, and concluded that Mr. Jones

> is able to understand, remember, and carry out 2-step job instructions. It would appear he would have trouble concentrating, showing attention, and tolerating work stress from a mental status perspective. He admitted "I'm going to try for this disability this one time, and then if necessary, I will turn to theft or whatever I have to do if I don't get social security disability."

Tr. 391. Dr. Forsyth's diagnostic impression included (1) complex post-traumatic stress disorder; (2) bipolar mood disorder; (3) nicotine abuse continuous; (4) report of chronic pain; and (5) rule out personality disorder with mixed traits and sociopathy. *Id.*

The ALJ found Dr. Forsyth's opinion *not persuasive*. The ALJ explained:

> Dr. Forsyth noted some abnormalities such as sporadic eye contact and mildly impaired social judgment, but findings also revealed at least average intelligence, and ability to attend, concentrate, and show persistence during the examination, and a cooperative demeanor. This is not supportive of a restrictive limitation for two-step instructions. The doctor's references to concentration, attention, and work stress limitations are vague and ill-defined as well, making an evaluation of such limitations difficult. Further, intelligence testing in 2023 confirmed average scores and average working memory, (ex. 13F), consistent with few cognitive or concentration limitations. The claimant also demonstrated independence with activities of daily living including shopping and going out alone despite an absence of formal mental health treatment. He was able to move across several states and obtain housing in late 2021 and early 2022, inconsistent with a marked inability to adapt to and handle stress and change. Accordingly, the evidence is not consistent with Dr. Forsyth's opinion.

Tr. 30.

2.    **Barbara Markway, Ph.D.**

On November 23, 2021, nonexamining State agency psychological consultant Barbara

Markway, Ph.D., reviewed the medical evidence record at the initial level of review.[5]  Tr. 72-73,

79-80.  Dr. Markway prepared a Psychiatric Review Technique ("PRT")[6] and rated the degree of

Mr. Jones' functional limitation in the area of understanding, remembering, or applying

information as *none*; in the area of interacting with others as *moderate*; in the area of maintaining

concentration, persistence, or pace as *moderate*, and in the area of adapting or managing oneself

as *none*.  Tr. 72, 79.  Dr. Markway explained that

> The medical evidence in the file supports the completed PRT and MRFC
> limitations.  While claimant's allegations are severe in nature he currently does not
> participate in prescribed treatment, through medication or therapy.  Thus DDS is
> unable to determine if symptoms would lessen with a prescribed treatment.
> Claimant does report prior use of prescribed medications and that they "made him
> more aggressive."  He also states he "self medicates" regularly with marijuana as it
> helps with the symptoms and is not an addiction.  DAA is not material.

Tr. 73, 80.

Dr. Markway also prepared a Mental Residual Functional Capacity Assessment

("MRFCA") in which she found that Mr. Jones had *no limitations* in his ability to understand,

remember, or adapt.  Tr. 74-75, 81-82.  In the areas of sustained concentration, persistence, and

social interaction, Dr. Markway found that Mr. Jones was *not significantly limited* in his ability

to (1) carry out very short and simple instructions; (2) carry out detailed instructions;

(3) maintain attention and concentration for extended periods; (4) perform activities within a

---

[5] Dr. Markway indicated she reviewed Dr. Forsyth's consultative exam and function report.  Tr. 72.

[6] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain

an ordinary routine without special supervision; (6) make simple work-related decisions;

(7) complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; (8) ask simple questions or request assistance; and (9) maintain socially appropriate

behavior and to adhere to basic standards of neatness and cleanliness.  *Id.*  Dr. Markway found

that Mr. Jones was *moderately limited* in his ability to (1) work in coordination with or in

proximity to others without being distracted by them; (2) interact appropriately with the general

public; (3) accept instructions and respond appropriately to criticism from supervisors; and

(4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

*Id.*

Based on her findings, Dr. Markway assessed that Mr. Jones was able to work in a

moderately complex environment with limited contact with the general public, supervisors, and

coworkers.  *Id.*

The ALJ found Dr. Markway's assessment *generally not persuasive*.  Tr. 30.  The ALJ

explained that

> Dr. Markway noted an absence of prescribed treatment, signs of normal orientation
> and an ability to concentrate and persist during a consultative examination in late
> 2021 and allegations of aggressive behavior which are supportive of few workplace
> complexity limitations and some interaction limitations.  . . .  However, the
> undersigned had additional evidence such as the claimant's reports of a more
> limited ability to concentrate and follow instructions, as well as additional signs of
> tangential thought process, . . . and an abnormal mood, . . ., that support additional
> moderate limitations in the paragraph B areas and more restrictive work-related
> limitations.

Tr. 30.

### 3.    <u>Ben Archer Health Center – Clyde Miller, M.D.</u>

On February 2, 2022, Mr. Jones presented to Clyde Miller, M.D., to establish care.

Tr. 496-99.  Mr. Jones reported a history of PTSD, bipolar disorder, and multiple personality

disorder.  *Id.*  Mr. Jones reported he currently did not take any medications.  *Id.*  On exam,

Dr. Miller noted, *inter alia*, that Mr. Jones was well appearing, in no acute distress, had a normal

level of consciousness, normal mental status, normal appearance, euthymic mood, normal affect,

and normal thought content.  *Id.*  Mr. Jones scored 15 on a PHQ-9 Questionnaire.  *Id.*  Dr. Miller

indicated that Mr. Jones' "[a]ctivities of daily living are not difficult at all for the patient due to

the depression symptoms, in the last 2 weeks, as identified in the PHQ-9 questionnaire."  *Id.*

Dr. Miller indicated he planned to refer Mr. Jones to a mental health provider.  *Id.*

Mr. Jones presented to Dr. Miller nine more times from February 2, 2022, through

January 4, 2023.  On February 9, 2022, Mr. Jones presented for lab results and Dr. Miller's

treatment note indicated he was well appearing and in no acute distress.  Tr. 492-93.

On March 29, 2022, Mr. Jones presented to Dr. Miller seeking referrals for knee, left foot

and shoulder pain.[7]  Tr. 482-83.  *Id.*  Dr. Miller's treatment note indicated Mr. Jones was well

appearing, in no acute distress, and that his mental status was normal.  *Id.*

On April 12, 2022, Mr. Jones presented to Dr. Miller and explained that his prospective

apartment manager required a letter prescribing Mr. Jones an emotional support animal.[8]  Tr.

---

[7] Mr. Jones saw providers at Memorial Bone and Joint seven times between April 19, 2022, and June 28, 2022, for bilateral shoulder pain, knee pain, and foot pain.  Tr. 431-33, 434-37, 438-43, 444-47, 448-51, 452-55, 456-59. Relevant to his alleged mental health impairments, Mr. Jones consistently reported at each visit, *inter alia*, no depression, no sleep disturbances, no anxiety, no hallucinations, no suicidal thoughts, no mood swings, no memory loss, no agitation, no delirium, and no fatigue.  *Id.*  On physical exams, providers consistently indicated, *inter alia*, that Mr. Jones was oriented to time, place, and person, had normal mood and affect, was active and alert, had good insight and judgment, and had normal recent and remote memory.  *Id.*

[8] On April 19, 2022, Dr. Miller prepared a "To Whom It May Concern Letter" on Mr. Jones' behalf indicating that, due to mental illness, Mr. Jones had certain limitations regarding social interactions and coping with stress and anxiety.

479-80.  Dr. Miller's treatment note indicated, *inter alia*, that Mr. Jones was well appearing, in no acute distress, had a normal mental status, normal appearance, normal affect, euthymic mood, and no impaired thought content.  *Id.*

On April 29, 2022, Mr. Jones presented to Dr. Miller and reported that earlier that day he unsuccessfully attempted to secure disability and public assistance after which he had a "dissociative episode."  Tr. 477.  Mr. Jones reported when he "became aware of himself" he was at a bus station and had an empty bottle of alcohol in his coat pocket.  Tr. 477.  On physical exam, Dr. Miller indicated that Mr. Jones was well appearing, in no acute distress, had a normal level of consciousness, no observed disorientation, normal speech, normal appearance, normal affect, euthymic mood, and no impaired thought content.  *Id.*

On May 16, 2022, Mr. Jones presented to Dr. Miller seeking paperwork for General Assistance Program.  Tr. 475-76.  Dr. Miller's treatment note indicated that Mr. Jones was in no acute distress, had a normal level of consciousness, normal mental status, normal appearance, normal affect, euthymic mood, and no impaired thought content.  *Id.*

On July 12, 2022, Mr. Jones presented to Dr. Miller and reported he would not be seeing specialists for a while due to transportation issues.  Tr. 473-74.  Mr. Jones requested pain medication.  *Id.*  Dr. Miller noted on exam, *inter alia*, that Mr. Jones was in no acute distress and that his mental status was normal.  *Id.*

On August 18, 2022, Mr. Jones presented to Dr. Miller and reported being in a car accident and experiencing neck, bilateral knee, and left leg pain.  Tr. 471-72.  Mr. Jones

---

Tr. 481.  Dr. Miller indicated he was prescribing an emotional support animal to assist Mr. Jones in "coping with his disabilities and [to] enhance his quality of life."  *Id.*

requested stronger pain medication. *Id.* Dr. Miller noted on exam, *inter alia*, that Mr. Jones was well appearing, in no acute distress, and had normal mental status. *Id.*

On September 20, 2022, Mr. Jones presented to Dr. Miller and reported bilateral knee, shoulder, and neck pain. Tr. 539-40. Mr. Jones requested refills on his medications. *Id.* On exam, Dr. Miller noted, *inter alia*, that Mr. Jones was well appearing, in no acute distress, had a normal level of consciousness, normal mental status, normal appearance, normal affect, euthymic mood, and no impaired thought content. *Id.*

On January 4, 2023, Mr. Jones presented to Dr. Miller for follow up on pain and difficulty sleeping. Tr. 560-62. Dr. Miller noted that chronic joint pain was affecting Mr. Jones' quality of life and ability to work and that he believed Mr. Jones should be placed on disability due to chronic joint pain. *Id.*

### 4. Mois Johnson, MMHNP

On January 4, 2023, Mr. Jones presented to Mois Johnson, MMHNP, for psychological evaluation. Tr. 544-51. The New Mexico Department of Social Security Disability Determination referred Mr. Jones to MMHNP Johnson to assist in the determination of his benefits eligibility. *Id.* Mr. Jones reported PTSD, depression, anxiety, and identity disorder/multiple personalities. *Id.* MMHNP Johnson took Mr. Jones' background information, psychiatric history, personal/work/family histories, and other pertinent medical events. Mr. Jones reported spending most days at home with his dogs, cats, and spouse. *Id.* Mr. Jones reported being able to use his phone/computer, cook, do laundry, wash dishes, drive, shop, vacuum, sweep, and care for his pets. *Id.* Mr. Jones reported being capable of attending to all activities of daily living. *Id.* Mr. Jones reported not being able to get along with others. *Id.*

On mental status exam, MMHNP Johnson noted that Mr. Jones was groomed, hygienic, and appropriately dressed; his manner and approach to the evaluation was appropriate; his attitude and behavior were appropriate; his stream of mental acuity was spontaneous and well organized; he had poor eye contact; his speech rate and rhythm were regular; his speech volume and tone were normal; his language was appropriate for his age; his thought process was linear; his thought content was free of hallucinations, delusions, persecutions, paranoia, and obsessions; he had a tearful affect during session; described his mood as "cranky/depressed"; and he had good judgment and poor insight.  Tr. 546-47.  MMHNP Johnson administered a Mini-Mental State Examination on which Mr. Jones scored 30/30.  Tr. 547-48.

MMHNP Johnson listed diagnoses of major depressive disorder, PTSD, generalized anxiety disorder, and history of mood disorder.  Tr. 549.  MMHNP Johnson's overall impression states that

> it appears the patient experiences symptoms of PTSD, MDD and GAD, including flashback, hypervigilant, must face door, loud noises cause flight or fight mood, insomnia, nightmares, pace a lot, fidget a lot, thoughts of suicide, sadness, low energy, crying episode, sometimes wishes he was dead, insomnia, blackout and loose [sic] time if over stressed, sometimes introduces self as other names to spouse, does stuff he doesn't remember.  These symptoms are distressing, they do seem to significantly affect their [sic] day-to-day function.

Tr. 549.

MMHNP Johnson assessed Mr. Jones' limitations in his ability to do work-related mental functions as follows:

> Understand, retain, and follow instructions: None – Able to function in this area independently, appropriately, effectively, and on a sustained basis.

> Sustain attention to perform simple, repetitive tasks:  None – Able to function in this area independently, appropriately, effectively, and on a sustained basis.

Relate to others, including fellow workers and supervisor: Moderate – Functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

Tolerate the stress/pressures associated with day-to-day-work activity: Marked – Functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

*Id.*

The ALJ found MMHNP Johnson's opinion *mostly persuasive*, "although it differs somewhat from the residual functional capacity." Tr. 29. The ALJ explained that

Nurse Johnson's examination confirmed normal mini-mental status examination scores and noted normal speech, thought process, and thought content findings. [] However, the claimant presented with poor eye contact, poor insight, and a tearful affect. The test scores and findings are supportive of few task or concentration limitations but still point to interaction and stressor limitations that Nurse Johnson identified. To the extent the opinion provides for limitations, it is consistent with earlier findings of an abnormal mood, [], and with the claimant's reports of difficulty getting along with others and allegations of problems handling stress and changes in routine.

Nonetheless, the opinion is not fully consistent with the longitudinal record. The absence of formal mental health treatment, the claimant's move to New Mexico in early 2022 and ability to obtain housing shortly after, and the claimant's independence with activities of daily living are not suggestive of marked limitations with handling stress and work pressures. Thus, the residual functional capacity better accounts for workplace environment limitations with occasional change in work setting and with noise limitations.

The residual functional capacity also provides for two-hour blocks of attention and concentration, and occasional production rate work limitations that differ with Nurse Johnson's findings, but those limitations are more responsive to the claimant's allegations of memory and concentration difficulties. The residual functional capacity's interaction, simple instruction, simple work-related decision otherwise fall within Nurse Johnson's expression of the claimant's abilities, although the simple instructions and simple decision limitations are potentially more restrictive in light of the claimant's allegations of lapses of memory.

Tr. 29.

5.    **Marc A. Caplan, Ph.D.**

On February 18, 2023, Mr. Jones referred himself to Dr. Caplan to identify his overall

level of psychological and cognitive functioning.  Tr. 571-85.  Dr. Caplan obtained academic,

medical, employment, legal and marital histories.  *Id.*  Dr. Caplan conducted a mental status

exam and observed that

> [Mr. Jones] was groomed appropriately and casually dressed.  Eye contact was
> good. . . .  He was cooperative throughout the evaluation process and rapport was
> easily established.  The rate and volume of speech was normal.  Throughout testing
> he remained focused and was able to follow directions and answer questions
> appropriately.  He appeared to be nervous and hasty when giving responses at times.
> His mood was normal and affect congruent.  There was no current evidence of
> delusional thoughts or hallucinations.  His long term and short-term memory appear
> to be intact.  Mr. Jones is estimated to be functioning within the average range of
> intelligence.

Tr. 573.

Dr. Caplan administered the following tests:  Wechsler Adult Intelligence Scale-4th

Edition; Millon Clinical Multiaxial Inventory – 4th Edition; Personality Assessment Inventory;

Structured Inventory of Malingered Symptoms; Multidimensional Anxiety Questionnaire;

Dissociative Experiences Scale-2[nd] Edition; and Neuropsychological History Questionnaire.  Tr.

571, 573-583.

Dr. Caplan summarized that Mr. Jones' general cognitive ability was in the average

range; that he was irritable, depressed, and moody and lacked outlets for his intense emotions

leading to a high susceptibility to mental disorders such as anxiety and depression; that there

were no clear indications of a dissociative identity disorder; that based on Mr. Jones' reported

recurrent suicidal thoughts he should be evaluated immediately and appropriate interventions

implemented without delay; and that Mr. Jones has considerable problems with temper and

aggressive behavior exacerbated by agitation, limited capacity for empathy, and affective

lability.  Tr. 583-84.  Dr. Caplan identified particular areas of attention or concern if Mr. Jones

were to consider treatment.  Tr. 585.  Dr. Caplan's diagnostic impression included major

depressive disorder, persistent depressive disorder, and PTSD.  *Id.*

> The ALJ explained that
>
> Dr. Caplan did not provide explicit work-related limitations, although he did note
> symptoms and behavioral tendencies that were common to individuals who
> provided similar test responses.  []  The doctor also elaborated on areas of attention
> if the claimant should pursue treatment or therapy.  []  Consequently, Dr. Caplan's
> examination report is not a medical opinion that requires an evaluation of
> persuasiveness.  []  Nonetheless, the undersigned has still considered the report as
> "other medical evidence," [].

Tr. 30.

### 6.    Jill Blacharsh, M.D.

On January 31, 2023, nonexamining State agency psychological consultant Jill

Blacharsh, M.D., reviewed the medical evidence record at reconsideration.[9]  Tr. 88-89, 102-103.

Dr. Blacharsh prepared a PRT and rated the degree of Mr. Jones' functional limitation in the area

of understanding, remembering, or applying information as *none*; in the area of interacting with

others as *moderate*; in the area of maintaining concentration, persistence, or pace as *moderate*,

and in the area of adapting or managing oneself as *moderate*  Tr. 88, 102.  Dr. Blacharsh

explained that

> [r]eviewed initial evidence and agree with Initial assmt of semi-skilled level work.
> Reviewing evidence at Reconsideration, new allegation of dissociation, FR's
> elaborate yet no mention at Initial CE, in Initial FR.  The only mention of possible
> dissociative sx's are episodes which PCP described as syncopal for which a
> neurological consult was ordered but unclear that clmt obtained.  Noted at 01/2023
> CE "cranky/depressed" mood, tearful affect, reported paranoia [although no
> specifics are provided] poor I, and some difficulty interacting with the examiner,
> MMSE=30/30 s/o no neurocognitive impairment.   CEP's MSO is partially
> persuasive in that it is partially supported by the exam.  It will therefore be given

---

[9] Dr. Blacharsh indicated she reviewed Dr. Forsyth's October 4, 2021, consultative exam; treatment notes from Ben
Archer Health Center; and MMHNP Johnson's January 4, 2023, psychological evaluation.  Tr. 88, 102.

only some wt.  Functionally, clmt has moderate limitations in interacting, coping with stress, adapting to changes.  Considering the Reconsideration evidence, clmt cont to have the capacity for semi-skilled level work.  Please see MRFC.

Tr. 89, 103.

Dr. Blacharsh also prepared a MRFCA in which she found that Mr. Jones had *no limitations* in his ability to understand and remember.  Tr. 94-95, 108-109.  In the areas of sustained concentration, persistence, social interaction, and adaptation, Dr. Blacharsh found that Mr. Jones was *not significantly limited* in his ability to (1) carry out very short and simple instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) make simple work-related decisions; (7) ask simple questions or request assistance; (8) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (9) be aware of normal hazards and take appropriate precautions; (10) travel in unfamiliar places or use public transportation; and (11) set realistic goals or make plans independently of others. *Id.*  Dr. Blacharsh found that Mr. Jones was *moderately limited* in his ability to (1) work in coordination with or in proximity to others without being distracted by them; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) respond appropriately to changes in the work setting. *Id.*

Based on her findings, Dr. Blacharsh assessed that Mr. Jones "can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, interact with co-workers and supervisors and respond appropriately to changes in a routine work setting with limited social contact." Tr. 95, 109.

The ALJ found Dr. Blacharsh's assessment *largely persuasive*. Tr. 28-29. The ALJ explained that

> [i]t provides for limited task complexity, limited interaction with others in the workplace, and few workplace changes. The doctor considered the claimant's allegations of depression and PTSD symptoms, among others. She noted the claimant's normal scores on a mini-mental status examination that weighed against a neurocognitive impairment but also acknowledged evidence of difficulties with interaction with a consultative psychologist and signs of poor insight. (Ex. 6A, 8A). This evidence is supportive of a capacity for less complex tasks and a need for interaction and workplace environment limitations. The limitations are also consistent with the claimant's lack of formal treatment for mental symptoms and with his independence with activities of daily living, which included use of a computer, an ability to go out alone, and an ability to shop in stores, to the extent they imply a capacity for performing a range of basic mental work activities on a regular and consistent basis.
>
> The residual functional capacity still differs somewhat from these limitations. It provides for more restrictive work instructions and work decisions, limited blocks of time for attention and concentration, occasional production rate work, noise limitations, and potentially more restrictive limitations. The undersigned had additional testimonial evidence from the claimant and additional examinations to consider, (ex. 13F, 14F), that support a moderate limitation in the area of understanding, remembering, and applying information and that supports somewhat greater work-related limitations. The residual functional capacity's provision for occasional changes in the work setting corresponds with Dr. Blacharsh's demand for a routine work setting with some forewarned changes in a usual stable work setting. To the extent the doctor's limitation may imply greater workplace environment limitations, the lack of formal mental health treatment and the claimant's interstate move and subsequent procurement of housing weigh against an inability to handle greater or more unpredictable changes than the residual functional capacity reflects.

Tr. 28-29.

B.    **Arguments**

1.    **The ALJ Did Not Pick and Choose From Uncontradicted Medical Opinion Evidence**

In his Motion, Mr. Jones first argues that the ALJ impermissibly "picked and chose" favorable portions of evidence from Exhibits 2F and 8F and ignored contrary material evidence without considering the experts' overall conclusions.  Doc. 15 at 8-15.  Exhibit 2F is a Clinical Psychological Evaluation conducted by Dr. Forsyth on October 4, 2021, to assist in determining disability.  Tr. 388-96.  Mr. Jones argues that while the ALJ relied on certain positive findings from Dr. Forsyth's evaluation, the ALJ failed to consider Dr. Forsyth's notations regarding Mr. Jones' avoidant and antisocial behavior.  Doc. 15 at 8-9.  Exhibit 8F includes treatment records from Ben Archer Health Center (Dr. Miller) from February 2022 through August 2022. Tr. 460-524.  Mr. Jones argues that the ALJ ignored (1) Dr. Miller's February 2, 2022, treatment note regarding Mr. Jones' PHQ-Questionnaire responses related to the previous two weeks, *i.e.,* feeling tired, decreased concentration, depressed, wishing to be dead or of hurting self, and low self-esteem; (2) Dr. Miller's April 19, 2022, letter to Mr. Jones' prospective apartment manager in which he described Mr. Jones as meeting the "definition of disability under the Americans with Disabilities Act, the Fair Housing Act, and the Rehabilitation Act of 1973," and needing an emotional support animal; and (3) Dr. Miller's April 29, 2022, treatment note regarding Mr. Jones' reported "dissociative" episode.  Doc. 15 at 8-9.

The Commissioner contends that the ALJ extensively discussed Dr. Forsyth's conclusions when assessing the medical opinion evidence and explained why Dr. Forsyth's conclusions were not persuasive as they were not supported by his own examination findings and inconsistent with Mr. Jones' demonstrated abilities.  Doc. 19 at 11-12.  The Commissioner notes that Mr. Jones does not challenge the ALJ's ultimate evaluation of Dr. Forsyth's opinion.  *Id.*

The Commissioner further contends that the ALJ cited Dr. Miller's letter in which Dr. Miller stated that Plaintiff met the definition of disability but explained that Dr. Miller's opinion was on an issue reserved for the commissioner – a finding Mr. Jones does not challenge. *Id.* at 12-13. Last, the Commissioner contends that Mr. Jones' reliance on Dr. Miller's notations of Mr. Jones' subjective complaints and symptoms is not medical evidence or medical opinion evidence and that the ALJ determined that Mr. Jones' subjective claims were less reliable than the medical evidence. *Id.* The Commissioner asserts that Mr. Jones' request of this Court to give greater weight to certain evidence is plainly asking the Court to reweigh the evidence, which it cannot do. *Id.*

The Tenth Circuit has made clear that ALJs may not mischaracterize an *uncontradicted* medical opinion by picking and choosing only the parts favorable to a finding of non-disability. *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007); *see also Frantz v. Astrue*, 509 F.3d 1299, 1302–03 (10th Cir. 2007) (same); *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (explaining that it is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence). Mr. Jones, however, has failed to show that is what happened here. To begin, Dr. Forsythe's opinion is not uncontradicted. To the contrary, the ALJ explained it was inconsistent with the medical evidence record at large and other medical opinion evidence. Tr. 30; *see* Section III.A., *supra*. That aside, rather than "cherry picking" the medical opinion Dr. Forsyth offered, the ALJ *rejected* it (Section III.A.1, *supra*) – a finding Mr. Jones does not contest. As such, the ALJ did not rely on Dr. Forsyth's opinion in assessing Mr. Jones' ability to do work-related mental activities. *See Staheli v. Comm'r, SSA*, 84 F.4th 901, 907 (10th Cir. 2023) (finding that the ALJ had not cherry picked from a medical opinion because the ALJ had rejected it).

As for Dr. Miller's treatment notes, Mr. Jones points to discrete entries from three notes, out of ten, as evidence of cherry picking. While the ALJ did not specifically discuss Mr. Jones' responses to the PHQ-9 Questionnaire administered at his initial presentation to Dr. Miller,[10] the ALJ did consider and discuss Mr. Jones' reported symptoms of depression and suicidal thoughts and specifically cited multiple treatment notes prepared by Dr. Miller and other providers in which Mr. Jones' depression screens were negative and wherein he reported no suicidal thoughts or attempts.[11] Tr. 25. The ALJ concluded that "[t]he negative depression screens and the denials of symptoms at examinations for physical symptoms implies that the claimant's mental symptoms are not as constant, pervasive, intense, or limited as he alleged." *Id.* The ALJ also discussed that the evidence did not establish Mr. Jones' alleged dissociative identity disorder as reported to Dr. Miller, and that he still considered Mr. Jones' alleged symptoms of dissociation in assessing Mr. Jones' ability to do work-related mental activities to the extent they were consistent with Mr. Jones' PTSD symptoms.[12] Tr. 20-21. And last, the ALJ noted and correctly explained that Dr. Miller's disability assessment related to prescribing an emotional support animal for Mr. Jones was "for other agencies and under other statutes" and that determining disability on behalf of Social Security is an issue reserved to the Commissioner. Tr. 31. The Court finds no error in the ALJ's discussion and explanation on this issue. *See Balthrop v.*

---

[10] *See L.A.P. v. Kijakazi*, No. 1:20-cv-3178-SKA, 2023 WL 6521119, at *5 (D. Colo. Sept. 26, 2023) (holding that a PHQ-9 is subjective evidence from plaintiff about an issue in their claim and under the new regulation the Commissioner is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements in paragraph (a)-(c)" of § 404.1520c(d) (*How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017*).

[11] The Court notes that Dr. Miller indicated on February 2, 2022, that Mr. Jones' "[a]ctivities of daily living are not difficult at all for the patient due to the depression symptoms, in the last 2 weeks, as identified in thePHQ-9 questionnaire." Tr. 498.

[12] The ALJ cited Dr. Caplan's report in which Dr. Caplan explained that Mr. Jones had no clear indication of a dissociative identity disorder and that testing suggested his dissociative experiences were related to PTSD. Tr. 21-21 (citing Tr. 584).

*Barnhart*, 116 F. App;'x 929, 932 (10th Cir. 2004) (unpublished); *see also* 20 C.F.R.

§§ 404.1527(d)(1) and 416.927(d)(1) ("A statement by a medical source that you are 'disabled'

or 'unable to work' does not mean that we will determine that you are disabled.").

Finally, the Court finds that Mr. Jones' argument essentially functions as an invitation to

reweigh the evidence before the ALJ, contrary to the charge of the applicable standard of review.

*See Deherrera v. Comm'r, SSA*, 848 F. App'x 806, 808 (10th Cir. 2021) (setting out the reviewing

court's standard of review and noting that it does not "reweigh the evidence or retry the case").

Recently, the Tenth Circuit eschewed the same type of request:

> [Claimant] advances several individual criticisms of the ALJ's analysis of the evidence, asserting that the medical evidence could have supported a finding of greater disability.... But while these arguments may show the ALJ could have interpreted the evidence to support a different outcome, they, at most, amount to invitations to reweigh the evidence, which [the reviewing court] cannot do.

*Deherrera*, 848 F. App'x at 810. Further, while the ALJ cannot pick and choose among medical

reports or use only portions of evidence that are favorable to his position and disregard those that

are not, this requirement does not mean that the ALJ must discuss every piece of controverted

evidence. *See Clifton*, 79 F.3d at 1009–10. Rather, it merely requires the ALJ to show that he

considered evidence unfavorable to his findings before making them. *See id.* The ALJ did so

here. And importantly, the prohibition on "picking and choosing" does not mean ALJs cannot

make a finding of non-disability after weighing all probative evidence on either side of the issue

and finding the evidence of non-disability more persuasive.

For all of these reasons, the Court finds the ALJ did not engage in picking and choosing

from Dr. Forsythe's medical opinion or from Dr. Miller's treatment notes in determining

disability or in formulating Mr. Jones' his ability to do work-related mental activities.

**2.    The ALJ Did Not Err In Finding that Dr. Caplan's Psychological Evaluation Was Not a Medical Opinion**

Mr. Jones next argues that the ALJ should have evaluated Dr. Caplan's psychological evaluation report as medical opinion evidence and that his failure to do so adversely and materially affected his decision regarding Mr. Jones' ability to do work-related mental activities. Doc. 15 at 10-13. Mr. Jones argues that by not evaluating Dr. Caplan's report as opinion evidence, the ALJ ignored Dr. Caplan's notes and summaries regarding Mr. Jones' reports of, *inter alia,* dissociation, alternate personalities, difficulties with thinking and concentration, feelings of worthlessness, hopelessness and sadness, and symptoms of anxiety, worry and stress. *Id.* Mr. Jones argues that by failing to evaluate Dr. Caplan's report as medical opinion evidence, the ALJ impermissibly engaged in "picking and choosing" and that there is a reasonable probability that a proper evaluation of Dr. Caplan's report would have changed the outcome of the ALJ's determination. *Id.*

The Commissioner contends that the ALJ reasonably found that Dr. Caplan's evaluation did not meet the definition of "medical opinion" pursuant to 20 C.F.R. §§ 404.1513(a)(2) and 416.913(a)(2) because nothing in the report outlines any specific workplace limitations. Doc. 19 at 14-19. The Commissioner further contends that the ALJ nonetheless considered Dr. Caplan's evaluation as other medical evidence as he was required to do and referenced it multiple times in his determination. *Id.* Finally, the Commissioner asserts that nothing in Dr. Caplan's report is inconsistent with the ALJ's assessed limitations of Mr. Jones' ability to do work-related mental activities. *Id.*

Social Security regulations define a "medical opinion" as

a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [he has] one or more impairment-related limitations or restrictions in [specified] abilities . . . [including his] ability to

23

perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting.

20 C.F.R. §§ 404.1513(a)(2)(ii) and 416.913(a)(2)(ii) (eff. March. 27, 2017).  Given this definition, it is undisputed that Dr. Caplan did not provide a statement regarding what Mr. Jones could do despite his impairments.  Further, Dr. Caplan's various narratives related to Mr. Jones' subjective reports and symptoms, test results, and Dr. Caplan's suggested treatment recommendations do not meet the definition of "medical opinion" because they do not provide an opinion about what Mr. Jones can still do despite his impairments.  *Id.*  As such, the Court finds that the ALJ was not required to evaluate Dr. Caplan's report as medical opinion evidence. *See Staheli*, 84 F.4th at 906.

Additionally, the ALJ's determination demonstrates he considered Dr. Caplan's report as "other medical evidence" when determining Mr. Jones' mental impairments and assessing Mr. Jones' ability to do work-related mental activities.  For instance, the ALJ discussed Dr. Caplan's mental status exam findings and test results regarding dissociative identity disorder, intelligence, working memory, processing speed, and symptom validity.  Tr. 20-22, 26-27.  The ALJ discussed and relied on Dr. Caplan's diagnostic impressions in determining Mr. Jones' mental impairments.  Tr. 26.  Finally, the ALJ discussed and relied on Dr. Caplan's report (Ex. 13F), *inter alia*, to support greater work-related limitations in his RFC, *i.e.,* "more restrictive work instructions and work decisions, limited blocks of time for attention and concentration, occasional production rate work, noise limitations, and potentially more restrictive interaction limitations."  Tr. 29.

In sum, the Court finds the ALJ did not err by failing to evaluate Dr. Caplan's report as a medical opinion.  The Court further finds that the ALJ's determination reflects that he considered

Dr. Caplan's report and provided a narrative discussion describing how this evidence supported his conclusions. *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (explaining that the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence.").

### 3.    The ALJ's RFC Is Supported by Substantial Evidence

Mr. Jones next argues that the ALJ's determination is not supported by substantial evidence. Doc. 15 at 13-14. In support, Mr. Jones perfunctorily argues that the ALJ (1) only made one reference to Exhibit 4F; (2) found Mr. Jones was moderately limited in all four areas of mental functioning at step two; (3) failed to incorporate limitations assessed by Drs. Forsyth and Caplan or FNP-C Bracamonte; (4) relied on a nonexamining State agency psychological consultant; and (5) failed to give preference to MMHNP Johnson's assessment that Mr. Jones was markedly limited in his ability to tolerate the stress/pressures associated with day-to-day work activities. *Id.*

The Commissioner contends that the ALJ appropriately assessed Mr. Jones' workplace limitations after weighing all the evidence, including Mr. Jones' reported symptoms, treatment history, examination findings, and relevant opinion evidence. Doc. 19 at 8. The Commissioner contends that the question is not whether the Court or a different fact finding could have found Mr. Jones disabled, but rather whether substantive evidence, *i.e.,* "more than a mere scintilla," supports the ALJ's factual findings. *Id.* The Commissioner contends that the answer in this case is yes. *Id.*

Assessing a claimant's RFC is an administrative determination left solely to the Commissioner "based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71

(10th Cir. 2009); *see also* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at \*2 (an individual's RFC is an administrative finding).[13]  In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record.  *Wells,* 727 F.3d at 1065; *see* 20 C.F.R. §§ 404.1545(a)(2) and (3), 416.945(a)(2).  If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8p, 1996 WL 374184 at \*7.   Further, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at \*7).  When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion with citations to specific medical facts and nonmedical evidence, the court will conclude that the ALJ's RFC assessment is not supported by substantial evidence.  *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003).  Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "As long as substantial evidence supports the ALJ's determination, the Secretary's decision stands." *Id.*  The ALJ's decision must be

---

[13]  The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017.  82 Fed. Reg. 5844, 5845, 5867, 5869.

sufficiently articulated so that it is capable of meaningful review. *See Spicer v. Barnhart*, 64 F.

App'x 173, 177-78 (10th Cir. 2003) (unpublished).

To begin, the Court is under no obligation to address arguments lacking for adequate

development. *Glossip v. Chandler*, No. 14-CV-665, 2021 WL 4760383, at *7 (W.D. Okla.

Oct. 12, 2021) (stating that the "district court is free to disregard arguments that are not

adequately developed"). Mr. Jones' substantial evidence argument arguably falls into this

category. The Court nonetheless addresses his cursory list of alleged oversights by the ALJ.

First, Exhibit 4F is a November 8, 2021, disability assessment report prepared by FNP-C

Tiffany Bracamonte.[14]  Tr. 398-400. Mr. Jones argues the ALJ referred to this report only once

in his determination. Doc. 15 at 13. Mr. Jones further argues that ALJ failed to account for his

subjective complaints as reported to FNP-C Bracamonte and to discuss FNP-C Bracamonte's

notation under "Diagnosis" that states Mr. Jones described "he is concerned if he is triggered

then he will go into fight mode and end up in prison." *Id.*  Mr. Jones contends this entry is

highly suggestive that he is markedly limited in his ability to interact with others. *Id.*  As to the

former, Mr. Jones is simply wrong that the ALJ referred only once to FNP-C Bracamonte's

report in his determination. *See* Tr. 22, 25, 26, 27, 28, 31. As to the latter, FNP-C Bracamonte

indeed included Mr. Jones' description regarding his explosive temper and aggressive behavior

in her "Diagnosis" summary as he reported to her, but goes on to explicitly state that

> I do not have any medical records confirming diagnosis, *thus his reports are*
> *subjective at this point.  I did not observe any psychiatric abnormalities during my*
> *exam.*  He was pleasant, polite, cooperative, alert, and appropriate. . . . There were
> no communication deficits.  He gave good effort on exam.

---

[14] FNP-C Bracamonte only assessed functional limitations related to Mr. Jones' ability to do work-related physical
activities.  Tr. 400.

Tr. 400 (emphasis added). That Mr. Jones failed to frame his argument in the full context of FNP-C Bracamonte's diagnostic summary is disingenuous. Moreover, the ALJ's determination demonstrates the ALJ considered and referred to FNP-C Bracamonte's report in the context of Mr. Jones' alleged mental impairments, *i.e.,* judgment intact (Tr. 22), no psychiatric abnormalities noted (Tr. 25), normal orientation and intact memory and concentration (Tr. 26), and independence with personal care (Tr. 28).

Second, Mr. Jones states that the ALJ found Mr. Jones had moderate limitations in all four areas of mental functioning at step two of the sequential evaluation process. Doc. 15 at 13. Mr. Jones argues that the ALJ's step two findings supports a "conclusion that the individual's capacity to perform the activity is impaired and must be related with precision in an RFC finding." Doc. 15 at 13. Social Security regulations and rulings instruct that an adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." 20 C.F.R. §§ 404.1520a and 416.920a; SSR 96-8p, 1996 WL 374184, at *4. Further, a step-two finding of mild or even moderate restrictions in the four broad areas of mental functioning does not mandate the inclusion of mental limitations in a claimant's RFC at step four. *Bales v. Colvin*, 576 F. App'x 792, 798 (10th Cir. 2014); *Beasley v. Colvin*, 520 F. App'x 748, 754 (10th Cir. 2013). As the Tenth Circuit has observed, a step-two limitation "does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment." *Bales*, 576 F. App'x at 798 (emphasis added). Mr. Jones' bald argument, therefore, that the ALJ should have incorporated greater limitations in Mr. Jones' ability to do work-related mental activities at step four based on the ALJ's step two findings is unavailing.

Third, the Court has already addressed that the ALJ rejected Dr. Forsyth's assessment of Mr. Jones' ability to do work-related mental activities, a finding Mr. Jones did not contest, and also found that the ALJ did not improperly engage in picking and choosing from Dr. Forsyth's report. *See* Section III.B.1., *supra.* Additionally, neither Dr. Caplan nor FNP-C Bracamonte provided an assessment of functional limitations regarding Mr. Jones' ability to do work-related mental activities. As such Mr. Jones' argument that the ALJ failed to incorporate limitations from their reports is misplaced.

Fourth, Mr. Jones concedes that it is the ALJ's prerogative to rely on a nonexamining state agency consultant, but nonetheless wanted to note that because Dr. Blacharsh's assessment was confined to a review of the records, her assessment "lacked an essential reference." Doc. 15 at 14. This argument is without merit. "An ALJ is entitled to rely on all of the medical evidence, including that of nonexamining State agency medical and psychological consultants[.]" *See* SSR 96-6p, 1996 WL 374180 at *1-2; *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2008). The ALJ, therefore, was permitted to accept the findings of the state agency physicians who reviewed the record.

And fifth, Mr. Jones argues that MMHNP Johnson's assessment that Mr. Jones was markedly limited in his ability to tolerate the stress/pressures associated with day-to-day work activities should have pre-empted the ALJ's step two "moderate" findings. *Id.* As already noted, step two findings are not an RFC assessment and do not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment. That said, the ALJ explained his evaluation of MMHNP Johnson's opinion, including that the longitudinal record, the absence of formal mental health treatment, claimant's move to New Mexico, his ability to obtain housing, and his independence with activities of daily living were not suggestive of marked limitations

with handling stress and work pressures.  Tr. 29.  Mr. Jones does not contest the ALJ's explanation and the Court finds no error.

In sum, the Court finds Mr. Jones is essentially asking this Court to reweigh the evidence, which it cannot do.  The Court further finds that the ALJ reviewed all of the evidence in the record and that his determination included a narrative discussion of relevant evidence that reasonable minds might accept as adequate to support his conclusions.  As such, the Court finds the ALJ's RFC is supported by substantial evidence and sufficiently articulated so that it is capable of meaningful review.

### 4.    The ALJ Considered Mr. Jones' Impairments in Combination

Mr. Jones last argues that the ALJ failed to discuss how Mr. Jones' impairments acted in combination.  Doc. 15 at 14-15.  Mr. Jones argues, without more, that he has "an extremely high number of severe impairments" and that it was incumbent upon the ALJ to consider how Mr. Jones' physical impairments could aggravate his mental impairments and "other plausible scenarios."  *Id.*  Mr. Jones cites *Langley v. Barnhart*, 373 F.3d 1116 (10th Cir. 2004), and submits that the ALJ failed to comply with the *Langley* rule.  *Id.*

The Commissioner contends that Mr. Jones offers no legal support that an "extremely high number of severe impairments" somehow requires a *per se* finding of disability.  Doc. 19 at 22-23.  The Commissioner further contends that Mr. Jones' speculation as to functional limitations that do not exist in the record to support a claim that the ALJ did not properly consider his impairments in combination is unsupported and should be rejected.  *Id.*

The Court agrees.  Social security statutes explain that a claimant may be disabled by an impairment, or by a combination of impairments.  42 U.S.C. § 423(d)(2)B).  It is at *step two* of the sequential evaluation process that the ALJ considers the medical severity of a claimant's

alleged impairments, both individually and in combination, in the context of the duration requirement found in 20 C.F.R. §§ 404.1509 and 416.909.[15]  Then, at step three, the ALJ determines whether claimant's impairments, individually or in combination, meet or equal the severity of a listed impairment and meet the duration requirement.  20 C.F.R. §§ 404.1520(a)(4)(ii) and (iii) and 416.920(a)(4)(ii) and (iii).  At step four, "in formulating [his] RFC assessment, the ALJ must discuss the combined effect of all the claimant's medically determinable impairments, both severe and nonsevere." *Alarid v. Colvin*, 590 F. App'x 789, 797 (10th Cir. 2014) (citing *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013)).  "When an 'ALJ indicates []he has considered all the evidence, [the Court's] practice is to take the ALJ at h[is] word.'" *Bales v. Colvin*, 576 F. App'x 792, 799 (10th Cir. 2014) (quoting *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009)).  However, an ALJ's decision must contain sufficient explanation to permit a reviewing court to determine what evidence the ALJ relied upon in reaching her determination; an unsupported statement that the ALJ considered the effects of a particular impairment in conjunction with other impairments is inadequate.  *See, e.g.*, *Rodriguez v. Colvin*, CV 13-0978 WPL, 2014 WL 12789016, at *5-7 (D.N.M. Aug. 19, 2014).

With this in mind, Mr. Jones' reliance on *Langley* is misplaced.  The Tenth Circuit addressed *step two* of the sequential evaluation process in *Langley*.[16]  Yet Mr. Jones is not

---

[15] 20 C.F.R. §§ 404.1509 and 416.909 provide that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.  We call this the duration requirement."

[16] In *Langley*, the claimant argued, *inter alia*, that the ALJ erred in determining that she did not have any severe impairments or combination of impairments at *step two* of the evaluation process.  *Id.* at 1123.  The Tenth Circuit explained the Supreme Court's adoption of what is referred to as a "de minimus" standard with regard to the step two severity standard.  *Id.* at 1123 (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)).  The Tenth Circuit found that the record demonstrated that claimant suffered from joint disease or fibromyalgia, as well as chronic fatigue, migraines or chronic headaches, depression, and reflux disorder.  *Id.* at 1124.  Yet the ALJ failed to determine that any of claimant's alleged impairments were severe at step two, individually or in combination, and in not doing so then failed to assess the combined impact of her impairments on her ability to do work-related activities at step four.  *Id.* at 1124.

arguing that the ALJ failed to consider or omitted alleged impairments at step two of his

determination, or that in failing to do so it resulted in the ALJ's failure to assess the combined

impact of Mr. Jones' impairments on his ability to do work-related activities at step four.  Nor

does Mr. Jones argue that the ALJ failed to find that his alleged impairments, alone or in

combination, met or equaled a listed impairment at step three of his determination.  Instead,

Mr. Jones conclusorily argues that the ALJ failed to consider the limiting effects of his combined

impairments at step four.[17]  Mr. Jones contends that the sheer number of severe impairments the

ALJ determined at step two and the "easily assume[d]" and "plausible scenarios" of their

combined impact on his ability to do work-related activities would "*require* a finding of

disability" by the ALJ at step four.  Doc. 15 at 15 (emphasis added).  The Court is not persuaded.

The ALJ complied with the applicable legal standards in assessing Mr. Jones' RFC.

Here, the ALJ determined and listed all of Mr. Jones' impairments, both severe and nonsevere, at

step two.  Tr. 20-21.  The ALJ determined that Mr. Jones' impairments, individually or in

combination, did not meet or equal a listed impairment at step three.  Tr. 21-22.  The ALJ stated

he considered all of the claimant's medically determinable impairments, including those that

were deemed nonsevere, when assessing the claimant's residual functional capacity at step four.

Tr. 22-32.  The ALJ stated that he "considered all symptoms and to the extent to which these

symptoms can reasonably be accepted as consistent with the objective medical evidence and

other evidence."  Tr. 23.  The ALJ discussed Mr. Jones' testimony in which he described the

symptoms he experiences as a result of his impairments.  Tr. 23-24.  The ALJ extensively

discussed Mr. Jones' alleged symptoms in the context of his medically determinable

---

[17] Mr. Jones does not raise any issues regarding the ALJ's assessment of his ability to do work-related physical activities pursuant to 20 C.F.R. §§ 404.1567(c) and 416.967 (c) (describing medium exertional capacity involves lifting no more than 50 pounds occasionally and  frequently lifting 25 pounds).  Tr. 22.  RFC also includes ability to stand and walk for a total of 6 hours in an 8-hour workday.  *Id.*

impairments, the medical evidence record, and medical opinion evidence.  Tr. 24-32.  The ALJ

provided a detailed narrative describing how the evidence supports his RFC assessment, citing

specific medical facts and nonmedical evidence.  Tr. 23-32.  The Court, therefore, finds no error

in the ALJ's assessment Mr. Jones' RFC.  Moreover, Mr. Jones presents no legal authority or

actual evidence, instead relying on mere hypotheticals, to support his conclusory argument that

having a certain number of impairments at step two unquestionably results in a combined impact

at step four that requires a finding of disability.

For the foregoing reasons, the Court finds that the ALJ applied the correct legal standards

in considering the combined impact of Mr. Jones' severe and non-severe physical and mental

impairments in formulating his RFC assessment.

## IV.  <u>Recommendation</u>

For all of the reasons stated above, the Court finds that Mr. Jones's Motion is not well

taken.  The Court, therefore, recommends that the Motion be **DENIED.**

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of
these Proposed Findings and Recommended Disposition they may file written objections with
the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any
objections with the Clerk of the District Court within the fourteen-day period if that party
wants to have appellate review of the proposed findings and recommended disposition.  If
no objections are filed, no appellate review will be allowed.**

---

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**